Fee Paid

**FILED**

CLERK, U.S. DISTRICT COURT

**12/16/23**

CENTRAL DISTRICT OF CALIFORNIA

BY: _____ cs _____ DEPUTY

1   Adam Loew
    2501 Little Rock Lane
2   Simi Valley, CA 93065
    310-499-3662
3   Email:  Adam Loew

4

    Adam Loew, IN PRO PER
5

6

7               **UNITED STATES DISTRICT COURT**

8                  **CENTRAL DISTRICT OF**

                        **CALIFORNIA**
9                                          CV23-10733-SPG(Ex)

10  ADAM LOEW, STUDENT A THOUGH HER    )  Case No.:
    GUARDIAN ADAM LOEW And ALL OTHERS  )
    IN SIMILAR SITUATIONS              )  **Complaint for Damages;**
11                                     )
    Plaintiff(s),                      )  **Violations of the IDEA, 20 U.S.C. §§ 1400 *et seq.*,**
12  vs.                                )  **34 C.F.R. Pt. 300**
    JANICE GREENBERG, as a LAUSD Employee )
13  and Individually.                  )  **Violations of Section 504, 29 U.S.C. § 794, 34**
                                       )  **C.F.R. Pt. 104**
14  LOS ANGELES UNIFIED SCHOOL DISTRICT )
    ET. AL. (LAUSD)                    )  **Disability Discrimination - Failure to**
15                                     )  **Accommodate in Violation of Title II of the ADA**
    POMELO COMMUNITY CHARTER SCHOOL,   )  **42 U.S.C. §§ 12131 *et seq.*, 28 C.F.R. § 35.130**
16  CALIFORNIA STATE PTA, DBA TEAM     )
    POMELO,                            )  **Violations of Cal. Educ. Code §§ 56000 *et seq.*,**
17  MARGRET KIM as an Employee if LAUSD, )  **Cal. Code Regs. Tit. 5 §§ 3030 *et seq.***
                                       )
     DAVID BACA as an EMPLOYEE of LAUSD )  **AMERICAN WITH DISABILITIES ACT,**
18                                        **CALIFORNIA CIVIL CODE, Sections 54.1,**
    A DANIEL BAUMAN as an Individual and  **52, et. Seq**
19  LAUSD Employee;
    ANDREA GEWIRZ as a LAUSD Employee and **NEGLIGENCE**
20  Individually

21  Sophie Paletz, as an Individual and Individual and  **Infliction of Emotional Distress**
    member of CALIFORNIA STATE PTA, DBA
22  TEAM POMELO                                        **Defamation Per SE**

23  Daniel Paletz Individual as an Individual and      **NEGLIGENT SUPERVISION OF STUDENTS,**
    member of CALIFORNIA STATE PTA, DBA                **SUCH AS STUDENT A**
24  TEAM POMELO

25  Kermisch and Paletz et.al a California Corporation
    as a member of CALIFORNIA STATE PTA, DBA
26  TEAM POMELO

27  and

28  DOES 1-10 inclusive

                    Defendant(s).

**COMES NOW Plaintiff Adam Loew and Student A as Individuals and on behalf of all other in a similar situation, and alleges and avers as follows:**

## I.
## VENUE AND JURISDICTION

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and §§ 1343(a)(3) and (4), as this is an action for injunctive and declaratory relief brought pursuant to IDEA, 20 U.S.C. §§ 1400, et seq., and its implementing federal regulations, 34 C.F.R Part 300; Section 504, 29 U.S.C. § 794, and its implementing regulations, 34 C.F.R. Pt. 104; and Title II of the ADA, 42 U.S.C. §§ 12131 et seq., and its implementing regulations, 28 C.F.R. Pt. Plaintiffs also bring claims under California Education Code §§ 56000 et seq. and its implementing regulations, Cal. Code Regs. tit. 5 §§ 3000 et seq.  This Court has supplemental jurisdiction over Plaintiffs' Section 56000 claims  and other claims pursuant to 28 U.S.C.A. § 1367(a), as these claims are so related to Plaintiffs' claims under IDEA, Section 504, and ADA, that they form part of the same case or controversy. This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. § 2201

2    Defendants reside in the Central District of California and a substantial part of the events or omissions giving rise to this action arose in Los Angeles County, which is located within the Central District of California.  Members of the Class reside in the Central District of California. The Plaintiffs reside in the Central District of California.

PARTIES

3.    Plaintiff Student A (hereinafter "Student A") was born on April 19, 2014, and at all times relevant hereto was a resident of the County of Los Angeles and Ventura County and a student enrolled at **POMELO COMMUNITY CHARTER MAGNET SCHOOL**. Student A is 9 years old and in the 4th Grade. Student A is a 9-year-old fourth grade student at LASUD elementary school. An

relevant times, Student A resided within the jurisdiction of LAUSD.  Student A's academic

struggles began shortly after she started the fourth grade.  At the beginning of the first period of

Student A's fourth grade year, Student A's Loew observed that Student A's was far below grade

level in math, social studies, and Science. Loew requested that Student A's teacher, Alyssa

Gallette ('Gallette') provide Loew with specific details on Student A's grades and to schedule a

meeting to discuss Student A's Grades.  Over the following weeks Student A's grades continued to

decline, and Student A began to act out and receive negative and emotionally abusive discipline

as from Gallette which exacerbated Student A's disabilities. Due to the abusive behavior by

Gallette toward Student A, her parents became concerned that Student A may become suicidal.

4.      The Defendant only relied on the severe discrepancy standard in evaluating Student A and

did not take into consideration other factors to determine whether Student A had an SLD, such as

the fact that she had participated in general education reading interventions for the majority of

her first and second grade school years and still could not decode words.

5.      The Defendants improperly concluded that Student A was ineligible for special education

and related aids and services because she received "average" composite scores on several of the

standardized tests that were administered as part of LAUSD's IEP assessment process. However, it

was also noted that scores were too discrepant to calculate Student A's processing speed and

working memory, so it is unclear the procedure by which LAUSD used to determine that Student

A did not have a SED deficit. Because LAUSD failed to find Student A eligible for an IEP, Student A

is currently not receiving any special education and related aids and services from the Defendants

DISTRICT and Defendant ADMINISTRATOR GREENBERG.

6.      Defendant, LOS ANGELES UNIFIED SCHOOL DISTRICT  AND LAUSD School Board Member

Scott Schmerelson(hereinafter "DISTRICT" "Schmerelson" or"LAUSD"), at all times mentioned

herein was and is a public school district organized and operating under the laws of the State of

California, having its principal place of business in the County of Los Angeles, State of California.

DISTRICT purposely conducts substantial educational business activities in the State of California,

and was the primary entity owning, operating, and controlling Pomelo Community Charter School

Magnet and the activities and behavior of its employees and agents. Defendant DISTRICT is the

employer of all the individual Defendants named herein. Defendant DISTRICT is liable for all

damages to Plaintiff.

7.      Pomelo Community Charter School (hereinafter "Pomelo") at all times mentioned herein

was and is, an Elementary School within the DISTRICT, having its principal place of business in the

County of Los Angeles, State of California. Pomelo is under the supervision, control, and guidance

of DISTRICT, operating as an elementary school for students approximately 4 years of age through

approximately 10 years of age.

8.      Superintendent ALBERTO M. CARVALHO (hereinafter "CARVALHO"), Local Superintendent

DAVID BACA (hereinafter "BACA"), Principal JANICE GREENBERG (hereinafter "GREENBERG") Taft

Community of School Administrator MARGRET KIM (hereinafter "KIM") Principal ANDREA FERBER

(hereinafter "FERBER")  and Sandrea Quintanilla (hereafter referred to as Quintanilla),

(hereinafter collectively "ADMINISTRATORS") are adult individuals who Plaintiffs are informed

and believe, currently reside in the County of Los Angeles, California. In doing the acts and

omissions herein alleged, ADMINISTRATORS were employed as supervisors, employees, agents, or

servants of Defendant DISTRICT, LAUSD Teacher DANIEL BAUMAN (hereinafter "BAUMAN"),

LAUSD Teacher JORDAN SCHINDLER (hereinafter "SCHINDLER"),  and LAUSD Teacher ANDERA

GEWIRZ (hereinafter "GEWIRZ")

(hereinafter collectively "TEACHERS") are adult individuals who Plaintiffs are informed and

believe, currently reside in the County of Los Angeles, California. In doing the acts and omissions

herein alleged, TEACHERS were employed as supervisors, employees, agents, or servants of

Defendant DISTRICT and at all times herein relevant were acting in the scope and course of their

employment with Defendant DISTRICT and the acts and omissions of the said TEACHERS were the

proximate cause of the injuries and losses suffered by STUDENT A and Plaintiff LOEW.  At the time

of the adverse actions taken against STUDENT A and LOEW said TEACHERS were supervising

administrators and authority figures charged with implementing policy and procedures to ensure

student safety and well-being. Because TEACHERS were acting within the course and scope of

their employment and/or agency with Defendant DISTRICT, Defendant DISTRICT is liable in

*respondent superior* for the injuries caused by the acts and omissions of TEACHERS pursuant to

section 815.2 of the California Government Code.

9.      Defendant DOES 1 through 100, and each of them, were security personnel, teachers,

teachers' aides, counselors, mentors and/or other authority figures and thus employees, agents,

supervisors, representatives, officials and executives of Defendant DISTRICT, and at all times

mentioned herein said Defendants were acting within the course and scope of their employment

and/or agency with defendant DISTRICT, which is liable under *respondent superior* pursuant to

sections 820 and 815.2 of the California Government Code for the acts of said Defendants which

are alleged herein. Said Defendants are sued individually and in their capacity as herein and

above defined employees, agents, and representatives of Defendant DISTRICT.

10.      Defendants DOES 1 through 100 are sued herein under said fictitious names. Plaintiffs are

ignorant as to the true names and capacities of these DOES 1 through 100, whether individual,

corporate, associate, or other, and therefore sue said Defendants by such fictitious names. When

their true names and capacities are ascertained, Plaintiffs will request leave of Court to amend this complaint to state their true names and capacities herein.

11.    At all times mentioned herein, each Defendant was responsible in some manner or capacity for the occurrences herein alleged. Plaintiffs' damages, as herein alleged, were proximately caused by the Defendants, and each of them.

12.    . At all times mentioned herein Defendants were the agents, representatives and employees of each and every other Defendant. In doing the things herein alleged, Defendants were acting within the course and scope of said alternative personality, capacity, identity, agency, representation and/or employment and were within the scope of their authority, whether actual or apparent.

13.    At all times mentioned herein, Defendants were the trustees, partners, servants, joint venturers, shareholders, contractors, and/or employees of each and every other Defendant, and the acts and omissions herein alleged were done by them, acting individually, through such capacities and within the scope of their authority, and with the permission and consent of each and every other Defendant and said conduct was thereafter ratified by each and every other Defendant, and each of them is jointly and severally liable to Plaintiff.

14.    In compliance with Govt. Code § 910 et seq. Plaintiff filed a Claim against the Defendant DISTRICT on September 11, 2023, and Defendant DISTRICT rejected the claim by operation of law, pursuant to Govt. Code Section 912.4 on October 26, 2023, as 45 days have passed, and Defendant has rejected the claim.

15.    At all times mentioned herein, Plaintiff Adam and Student A (hereinafter "PLAINTIFF" or "Loew or Student A respectively") is and was a resident of the County of Ventura State of

California. Plaintiff Loew is the natural Father of Student A and asserts in this Complaint (a) in his capacity as a guardian of Student A, on behalf of himself and all others in similar situations.

**Statement of Facts**

16.     Student A was born on April 19, 2014, and at all times relevant hereto was a resident of the County of Los Angeles and Ventura County and a student enrolled at **POMELO COMMUNITY CHARTER MAGNET SCHOOL**. Student A is 9 years old and in the 4th Grade. Student A is a 9-year-old fourth grade student at LASUD elementary school. An independent evaluator hired by Kaiser Permanente Mental health service Dr Judd, recently diagnosed Student A with SEDs in ADHD, Impulse Control, Non- Generalized Anxiety, Social Emotional disorders. Student A has attended LAUSD elementary schools since she started Transitional kindergarten in the 2017-2018 academic year. At all relevant times, Student A resided within the jurisdiction of LAUSD.

17.     Plaintiff Student A's academic struggles began shortly after she started the fourth grade. Defendant DISTRICT, and ADMINISTRATOR Janice Greenberg assigned Defendant TEACHER to Plaintiff Student A's Class and the Teacher.   Defendant TEACHER Alyssa Gallette is credentialed as an Intern Teacher with an Intern California Teaching credential.   Defendant TEACHER Alyssa Gallette has a degree in Communication and does not appear to have any substantial formal training in Elementary School Education.   At the beginning of the first period of Student A's fourth grade year, Plaintiff Loew observed that Student A's was far below grade level in math, social studies, and Science. Plaintiff Loew requested that Student A's teacher, Defendant TEACHER Alyssa Gallette ('Gallette") provide Plaintiff Loew with specific details on Student A's grades and to schedule a meeting to discuss Plaintiff Student A's Grades.  Over the following weeks Plaintiff Student A's grades continued to decline, and Plaintiff Student A began to act out

and receive negative and emotionally abusive discipline as from Defendant TEACHER Gallette which exacerbated Plaintiff Student A's disabilities and inflicted sever emotional distress on Plaintiff Student A. Due to the abusive behavior by Defendant TEACHER Gallette toward Plaintiff Student A, her Plaintiff Loew became concerned that Student A, may become suicidal.

18.    On September 14th 2023, Plaintiff LOEW  request a Individualized Education for Plaintiff Student A which was denied without Defendant ADMINISTRATOR Greenberg, providing "Prior Written Notice"  When Plaintiff LOEW began to advocate for Plaintiff STUDENT A, Defendant ADMINISTRATOR Greenberg Retaliated against Plaintiff LOEW, and sent Plaintiff LOEW a Disruptive Persons Warning Letter (Warning Letter) sighting some events that had happened in the previous school year and others that had happen off campus.

19.    The Defendant ADMINISTRATOR Greenberg only relied on the severe discrepancy standard in evaluating Student A and did not take into consideration other factors to determine whether Student A had an SLD, such as the fact that she had participated in general education reading interventions for the majority of her first and second grade school years and still could not decode words.

20.    The ADMINISTRATOR Greenberg improperly concluded that Student A was ineligible for special education and related aids and services because she received "average" composite scores on several of the standardized tests that were administered as part of LAUSD's IEP assessment process. However, it was also noted that scores were too discrepant to calculate Student A's processing speed and working memory, so it is unclear the procedure by which LAUSD used to determine that Student A did not have a SED deficit.

21.    Because Defendant District, ADMINISTRATOR Greenberg and Defendant TEACHER Gallette failed to find Plaintiff Student A eligible for an IEP assessment, nor did  ADMINISTRATOR

Greenberg provide a Prior Written Notice offer the opportunity for Plaintiff Loew to the appeal and Advocated for Plaintiff Student A; Plaintiff Student A is currently not receiving any special education and related aids and services from  Defendants DISTRICT, Defendant ADMINISTRATOR Greenberg.

22.    Every day, students bound through classroom doors, backpacks, and books in tow, full of endless potential. They sharpen their pencils, take their seats, and – perhaps unbeknownst.to them – they place their future in the hands of their educators. Accordingly, it is the urgent and ever-pressing responsibility of educators – teachers, schools, and school districts – to respect this tremendous act of trust. And with the futures of young lives hanging in the balance, this responsibility begins by ensuring *all students* are provided the critical foundational tools that are the conduit to success.

23.    "All students" includes the students this case is brought on behalf of: children with Metal and Emotional Health Issues such as Attention Deficit Disorder ("Mental and Emotional Disabilities"), enrolled in Los Angeles Unified School District ("LAUSD.").   A large number of children 3years old to 17 years old have Mental Health Disorders. Research between 2016- 2019 and by the Center for Disease Control ("CDC") shows that **ADHD, anxiety problems, behavior problems, and depression are the most commonly diagnosed mental disorders in children.** Estimates for ever having a diagnosis among children aged 3-17 years, in 2016-19, are given below.

A) ADHD 9.8% (approximately 6.0 million)

B) Anxiety 9.4% (approximately 5.8 million)

C)Behavior problems 8.9% (approximately 5.5 million)

D)Depression 4.4% (approximately 2.7 million)

24.     In California alone, 1 in 14 students are diagnosed with Serious Emotional Disturbance (SED) (exhibit B) estimated that more approximately 42,850 K-12 at LAUSD have a diagnoses of SED.

25.     Because SED disorders impact a vast student population, it's imperative that school districts, Schools, School Principals and School Teachers, like Defendants DISTRICT, ADMINISTRATORS AND TEACHERS., Pomelo Community Charter School Principal Janice Greenberg and Pomelo Teacher Alyssa Gallette (Defendants) not only educate themselves as to what SED disorders are, but also as to how to timely identify and appropriately serve all students who have them. As detailed throughout this Complaint, for years and years the Defendants have systematically refused to do either.

26.     SED disorders generally have a neurological basis, and most SED disorders are treatable. Many children with SED disorders are incredibly bright and capable, many are considered Gifted, but they must be taught in a different way than their typically developing peers. So long as students with SED disorders are properly and timely identified, a variety of research-based SED interventions can be implemented to dramatically increase Social Emotional skill and academic performance.

27.     When students with SED disorders are identified early and provided with the appropriate interventions and accommodations, they can progress through school with their peers and even excel. The number of talented members of society we stand to lose because the Defendants are simply unwilling to exert the time and resources necessary to identify students with SED disorders and provide the services and accommodations required for them to learn is untenable.

**Complaint Loew v Los Angeles Unified School District**

28.     Moreover, if ignored or inappropriately treated, SEDs can be devastating. Even students who are extremely intelligent will fail to perform at grade level, quickly fall behind their peers, and ultimately accomplish much less than their potential otherwise permits. Emotional consequences may also arise. For example, undiagnosed and/or untreated SED's disorders can lead to extreme frustration, aggravation, anxiety, depression, school avoidance and lifelong struggles. By refusing to identify and serve its students with SED disorders, the Defendants are failing children on multiple fronts and the results are heartbreaking.

29.     These are the types of harms Plaintiffs either have experienced or are likely to experience and are seeking to remedy and prevent. Defendants have systemically declined to timely identify, evaluate, and provide appropriate interventions and accommodations to students with SED disorders, which are necessary tools required for them to process information and thereby attain the foundational unit of their education. The Defendant's failures are long standing, willful and egregious violations of Plaintiffs' most fundamental rights under federal and state laws and implementing regulations ensuring the right to a free appropriate public education ("FAPE").

30.     Congress and the California legislature have mandated that children with SED disorders are entitled to special protections, to enhance their prospects of educational achievement. Under IDEA and related state law, a child with at least one of the thirteen disabilities enumerated in the law may be entitled to special education and related services and receive a FAPE. One of the eligible disabilities is a "specific learning disability" ("SLD"). SED, for example, a learning disability under which individuals have Serious Emotional Disturbance are included in the definition of SLD.

31.     Similarly, under Section 504 and ADA, a student is entitled to a FAPE if he or she "(i) has a physical or mental impairment which substantially limits one or more major life activities [such as

learning or reading], (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."

32.    To receive a FAPE, students with disabilities due to SED disorders typically require special education, such as appropriately intensive research-based mental and social emotional interventions related services, supplementary aids and services, and curricular accommodations and modifications, such as accessible materials, assistive technology ("AT"), and changes to curriculum, ("special education and related aids and services") as provided by law.

33.    Federal and state laws require every California school district to provide students with disabilities with a non-discriminatory and free appropriate public education in the least restrictive environment ("FAPE in the LRE"). These laws and the corollary California law place specific obligations on the Defendants DISTRICT,ADMINISTRATORS, AND TEACHERS to *timely* (1) identify schoolchildren who may have SED disorders, including children in early elementary school; respond appropriately to referrals for evaluation; (2) evaluate those children suspected to have SED disorders to determine their eligibility for special education and related aids and services; (3) provide children who have qualifying SED disorders the necessary special education and related aids and services so that they can make appropriate progress in the general education curriculum; and (4) continue to monitor and promote students' progress with meaningful parental involvement, by adhering to procedural safeguards, and providing timely periodic reviews and re-evaluations of students to effectively meet their learning needs.

34.    The Defendants DISTRICT, ADMINISTRATORS AND TEACHERS systematically fail to abide by these obligations. As a threshold problem, the Defendants makes no coordinated effort to identify students with suspected SED disorders. Rather, Defendant generally treats all struggling students the same, and takes insufficient steps to determine why they are struggling, *e.g.*, due to

a SED disorder or some other reasons. The result of this one-size-fits-all approach is that students with SED disorders are not appropriately or timely identified, and, even when placed in Academic programs that Defendant DISTRICT offers, students with SED are not appropriately served as Teachers such as Alyssa Gallette either **refuse** to implement the programs or have not been properly trained in these programs.  The Defendants DISTRICT'S General Education programs are not designed for students with SED's disorders, who typically struggle with ADHD, Impulse Control, Anxiety, Depression and ODD. Further, The Defendant DISTRICT policies maintains policies and practices that, *inter alia*, actively discourage parents from requesting that the defendants evaluate children with SED difficulties until those children have fallen years behind their peers, often forcing those families to seek private evaluations at their own expense, if they can. The Defendants often actively retaliate, intimidate, and engage in other adverse actions against parents that advocate for their children to received Special education evaluations The Defendants also fails to train its educators to recognize and appropriately address SED disorders; and fails to offer and provide special education and related aids and services necessary for students with disabilities due to reading disorders to receive a FAPE in the LRE.

35.    These are systemic failures that relate to a very common condition faced by a large population within Defendants educational purview, and which have wrought a devastating and costly impact on students and their families. These students have found and/or will find themselves at worst functionally high schoolers, and at best several levels or more below the grade in which they are enrolled, assuring they cannot access or benefit from relevant and grade-appropriate curriculum.

36.    The most recent State of California report on student test scores in Math and English shows that while that at the Los Angeles Unified School District on 30% are grade level in Math

- 13 -
**Complaint Loew v Los Angeles Unified School District**

and 41% are grade level in language Arts. (Exhibit).   The Defendants are already failing to provide students at LAUSD with an adequate education, and for students who receive special education, the outcomes are especially discouraging. failures, detailed herein, are a major contributor to these shortfalls.

37.     Plaintiff and purported Class Members, all of whom are students who are or will be enrolled in defendant DISTRICT, like any other students, have goals of learning, and seeking further education, employment, and independent living. However, these goals are essentially unattainable if Defendants DISTRICT continues to relegate these children to learning conditions that manifestly fail the standards and criteria demanded by the law. The named Plaintiffs in this action are LAUSD students with SED disorders and parents who have tried to obtain necessary special education and related aids and services from the Defendants DISTRICT, especially appropriately intensive research-based reading interventions and accommodations but have been deprived of access to these services because of Defendants' systemic refusals. Defendants DISTRICT continuously fails to provide Plaintiffs and other similarly situated students with a requisite FAPE in the LRE.

38.     Plaintiffs bring this action on behalf of themselves and the tens of thousands  of members of the Classes, defined below, for compensatory damages, punitive damages, declaratory and injunctive relief to require The Defendants to provide legally mandated services to schoolchildren with suspected disabilities and disabilities due to SED disorders, so that they can gain the essential life skill of learning manage their SEDs as early as possible along with their nondisabled peers and to participate fully in their education throughout their years in defendant DISTRICT schools, as are their rights. This action is necessary to bring an end to the immense personal and societal costs of LAUSD's fundamentally flawed response to Plaintiffs' learning needs.

**STANDING**

39.    The Plaintiff Student A has standing to bring this action to enforce Section 504 pursuant to 29 U.S.C. § 794a(a)(2), which provides that, "[t]he remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance . . .."

40.    Plaintiff Student A has standing to bring this action to enforce ADA pursuant to 42U.S.C. § 12133, which provides that "[t]he remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."

41.    Plaintiff LOEW and Plaintiff Student A have standing to bring this action to enforce California Education Code §§ 56000 *et seq and* Code §§ 51011 . pursuant to Cal. Educ. Code § 56500.1(a), which provides that "[a]ll procedural safeguards under the Individuals with Disabilities Education Act (20 U.S.C. Sec. 1400 and following) shall be established and maintained by each noneducational and educational agency that provides education, related services, or both, to children who are individuals with exceptional needs", including the right to bring a civil action under IDEA.

42.    Additionally, Plaintiffs LOEW have been denied rights under California Education Code sections **51101 which reads.**

43.    "(a) Except as provided in subdivision (d), the parents and guardians of pupils enrolled in public schools have the right and should have the opportunity, as mutually supportive and

respectful partners in the education of their children within the public schools, to be informed by the school, and to participate in the education of their children, as follows:

44.    (1) Within a reasonable period of time following making the request, to observe the classroom or classrooms in which their child is enrolled or for the purpose of selecting the school in which their child will be enrolled in accordance with the requirements of any interdistrict or interdistrict pupil attendance policies or programs.

45.    (2) Within a reasonable time of their request, to meet with their child's teacher or teachers and the principal of the school in which their child is enrolled.

46.    (3) To volunteer their time and resources for the improvement of school facilities and school programs under the supervision of district employees, including, but not limited to, providing assistance in the classroom with the approval, and under the direct supervision, of the teacher. Although volunteer parents may assist with instruction, primary instructional responsibility shall remain with the teacher.

47.    (4) To be notified on a timely basis if their child is absent from school without permission.

48.    (5) To receive the results of their child's performance on standardized tests and statewide tests and information on the performance of the school that their child attends on standardized statewide tests.

49.    (6) To request a particular school for their child, and to receive a response from the school district. This paragraph does not oblige the school district to grant the parent's request.

50.    (7) To have a school environment for their child that is safe and supportive of learning.

51.    (8) To examine the curriculum materials of the class or classes in which their child is enrolled.

**Complaint Loew v Los Angeles Unified School District**

52.    (9) To be informed of their child's progress in school and of the appropriate school personnel whom they should contact if problems arise with their child.

53.    (10) To have access to the school records of their child.

54.    (11) To receive information concerning the academic performance standards, proficiencies, or skills their child is expected to accomplish.

55.    (12) To be informed in advance about school rules, including disciplinary rules and procedures in accordance with Section 48980, attendance policies, dress codes, and procedures for visiting the school.

56.    (13) To receive information about any psychological testing the school does involving their child and to deny permission to give the test.

57.    (14) To participate as a member of a parent advisory committee, school site council, or site-based management leadership team, in accordance with any rules and regulations governing membership in these organizations. In order to facilitate parental participation, school site councils are encouraged to schedule a biannual open forum for the purpose of informing parents about current school issues and activities and answering parents' questions. The meetings should be scheduled for weekends, and prior notice should be provided to parents.

58.    (15) To question anything in their child's record that the parent feels is inaccurate or misleading or is an invasion of privacy and to receive a response from the school.

59.    (16) To be notified, as early in the school year as practicable pursuant to Section 48070.5, if their child is identified as being at risk of retention and of their right to consult with school personnel responsible for a decision to promote or retain their child and to appeal a decision to retain or promote their child.

**Complaint Loew v Los Angeles Unified School District**

60.    (b) In addition to the rights described in subdivision (a), parents and guardians of pupils, including those parents and guardians whose primary language is not English, shall have the opportunity to work together in a mutually supportive and respectful partnership with schools, and to help their children succeed in school. Each governing board of a school district shall develop jointly with parents and guardians, and shall adopt, a policy that outlines the manner in which parents or guardians of pupils, school staff, and pupils may share the responsibility for continuing the intellectual, physical, emotional, and social development and well-being of pupils at each school site. The policy shall include, but is not necessarily limited to, the following:

61.    (1) The means by which the school and parents or guardians of pupils may help pupils to achieve academic and other standards of the school.

62.    (2) A description of the school's responsibility to provide a high-quality curriculum and instructional program in a supportive and effective learning environment that enables all pupils to meet the academic expectations of the school.

63.    (3) The manner in which the parents and guardians of pupils may support the learning environment of their children, including, but not limited to, the following:

64.    (A) Monitoring attendance of their children.

65.    (B) Ensuring that homework is completed and turned in on a timely basis.

66.    (C) Participation of the children in extracurricular activities.

67.    (D) Monitoring and regulating the television viewed by their children.

68.    (E) Working with their children at home in learning activities that extend learning in the classroom.

69.    (F) Volunteering in their children's classrooms, or for other activities at the school.

**Complaint Loew v Los Angeles Unified School District**

70.      (G) Participating, as appropriate, in decisions relating to the education of their own child or the total school program.

71.      (c) All schools that participate in the High Priority Schools Grant Program established pursuant to Article 3.5 (commencing with Section 52055.600) of Chapter 6.1 of Part 28 and that maintain kindergarten or any of grades 1 to 5, inclusive, shall jointly develop with parents or guardians for all children enrolled at that school site, a school-parent compact pursuant to Section 6319 of Title 20 of the United States Code.

72.      (d) This section does not authorize a school to inform a parent or guardian, as provided in this section, or to permit participation by a parent or guardian in the education of a child, if it conflicts with a valid restraining order, protective order, or order for custody or visitation issued by a court of competent jurisdiction."

73.      Plaintiff Adam Loew have been denied his rights under California Education Code section 51011, specifically as it related to "To have a school environment for their child that is safe and supportive of learning."  and "To examine the curriculum materials of the class or classes in which their child is enrolled."

**STATUTORY FRAMEWORK**

74.      IDEA, Section 504, ADA and Section 56000 require that California school districts offer a "FAPE in the LRE" to children identified as disabled under those laws. ADA requires that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, such as a school, or be subject to discrimination by such entity. 42 U.S.C. § 12132. The

requirements regarding the provisions of FAPE, specifically described in Section 504 regulations, are incorporated in the general non-discrimination provisions of the applicable ADA regulation. 28 C.F.R. § 35.103(a).

**IDEA**

75.    IDEA is a federal grant program administered by the U.S. Department of Education ("DOE"). 20 U.S.C. §§ 1400 *et seq.* States, including California, that receive DOE funds must comply with the mandates contained in IDEA and its implementing regulations. In turn, school districts must comply with IDEA and meet IDEA-standards established by the state education agency, which is CDE in California. 20 U.S.C. § 1401(9)(B).

76.    DEA's primary mandate is the guarantee that "all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

77.    To carry out this broad mandate, The Defendants must have in effect policies, procedures, and programs to ensure that all children who are in need of special education and related aids and services are identified, located, evaluated and provided a specially designed Individualized Education Program ("IEP").   The specific mandates of IDEA require Defendants to (1) identify, locate and evaluate every child suspected of having a disability, residing in the district's jurisdiction ("Child Find Duty"); (2) provide procedural safeguards to children with disabilities and their

parents ("Procedural Safeguards Duty"); (3) consider data that demonstrate that prior, or as part of the referral process, students were provided appropriate instruction by qualified personnel ("Appropriate Instruction by Qualified Personnel Duty"); (4) comprehensively evaluate students to determine whether they are eligible for special education and related aids and services ("Evaluation Duty"); (5) after determining eligibility, offer and develop an IEP with effective special education and related aids and services, including appropriately intensive research-based interventions ("Special Education Duty"); and (6) monitor the efficacy of the special education and related aids and services provided to students, hold annual IEP meetings and more as needed to review progress and make changes or revisions to IEPs where necessary to ensure FAPE in the LRE ("Monitoring Duty"). 20 U.S.C. §§ 1400 *et seq.*; 34 C.F.R. Pt. 300*.*

78.     One of the specific mandates of IDEA is that "children with disabilities residing in the State and children with disabilities attending private schools . . . regardless of the severity of their disabilities, and who are in need of special education and related aids and services are identified, located, and evaluated . . .." 20 U.S.C. § 1412(a)(3)(A). This is known as the "Child.

79.     The Child Find Duty requires school districts to timely identify, locate, and evaluate all children with suspected disabilities. *Id.* § 1412(a)(3); 34 C.F.R. §§ 300.101(c), .111. School districts, thus, must fulfill their Child Find obligation; otherwise, a child who has a disability or suspected disability under IDEA will not be identified and accordingly, will not receive appropriate special education.

**Procedural Safeguards Duty**

80.      IDEA expressly includes certain procedural safeguards, requirements, and duties of school districts to ensure meaningful parental participation, notification, and consent through the special education process. 20 U.S.C. §§ 1400, 1412(a), 1414; Cal. Educ. Code §§ 56000 *et seq.*; *see also* 34 C.F.R. Pt. 300.

81.      As part of the "Procedural Safeguards Duty," school districts must give parents prior written notice within a reasonable time before they propose or refuse to initiate or change the identification, evaluation, or educational placement or the provision of FAPE in the LRE to the child. 34 C.F.R. § 300.503; Cal. Educ. Code § 56500.4. Thus, school districts must obtain informed written parental consent in order to support an initial evaluation of a student and an initial provision of special education services. Parental consent is further required to provide special education services and re-evaluations. Parental consent means that the parent is "fully informed of all information relevant to the activity for which consent is sought, in his or her native language, or through another mode of communication," and that the parent "understands and agrees" in writing to the carrying out of the activity for which his or her consent is sought 34 C.F.R. § 300.9.

82.      School districts must ensure that the parents of a child with a disability are members of the IEP team that makes determinations regarding eligibility (20 U.S.C. § 1414(b)(4)(a)) and any group that makes decisions on the educational placement of their child. *Id*. § 1414(e); Cal. Educ. Code § 56342.5. School districts must ensure that the parents are invited to each IEP team meeting and are afforded the opportunity to participate, which includes:

83.      (1) notifying parents of the meeting early enough to ensure that they will be able to attend; (2) provide information to parents; and (3) afford parents the opportunity to know the purpose of the meeting, who will participate, and to identify other representatives who should be invited. 20

U.S.C. §§ 1400, 1412(a), 1414, 1415; *see also* 34 C.F.R. §§ 300.309(b)(2) and (c), .311(a)(7)(ii)and (b), .321, 300.327, 300.501(c).

**Appropriate Instruction by Qualified Personnel Duty**

IDEA regulations provide that:

84.     To ensure that underachievement in a child suspected of having a specific learning disability is not due to lack of appropriate instruction in reading or math, the group must consider, as part of the evaluation described in §§ 300.304 through 300.306 - (1) Data that demonstrate that prior to, or as a part of, the referral process, the child was provided appropriate instruction in regular education settings, delivered by qualified personnel; and (2) Data-based documentation of repeated assessments of achievement at reasonable intervals, reflecting formal assessment of student progress during instruction, which was provided to the child's parents. 34 C.F.R. § 300.309(b).

85.     With respect to SLDs, IDEA additionally mandates that school districts that offer and provide "response-to-intervention programs" ("RTI") must provide "scientific, research-based intervention. 20 U.S.C. § 1414(b)(6)(B); 34 C.F.R. § 300.309(a)(2)(i). "RTI is a multi-tiered [instructional] approach to help struggling learners. Students' progress is closely monitored at each stage of intervention to determine the need for further research-based instruction and/or intervention in general education, in special education, or both."

86.     The rate of the student's progress in these interventions may be used as a part of the identification, referral, and evaluation process. 34 C.F.R. § 300.309(b)(1); Cal. Code Regs. tit. 5 §

3030(b)(10)(C)(4)(i) (2017). If the student participated in RTI, IDEA eligibility determinations must include additional documentation regarding instructional strategies used, student-centered data collected, and specific notice to parents regarding these services, strategies for increasing the student's rate of learning and their right to request an evaluation. 34 C.F.R. §300.311(a)(7); *see also* 34 C.F.R. § 300.311(b) (specific documentation requirements by persons involved in evaluations, including parents).

87.    Ineffective RTI services fail to collect valuable data to refer a student to special education, leading the student to receive only a limited response and ultimately, delayed special education evaluation and special education services.

**Evaluation Duty**

88.    Once a child is identified under Child Find, school districts must promptly seek parental consent to evaluate him or her for special education, under mandated timeframes, including when the child has not made adequate progress after an appropriate period of time when provided with appropriate instruction. 20 U.S.C. §§ 1414(b)(6); 34 C.F.R. §§ 300.301, 300.309(c). School districts must evaluate a child who is referred for an evaluation by a parent unless they provide adequate written notice giving their reasons for refusal. 34 C.F.R. § 300.503; Cal. Educ. Code § 56500.4. IDEA requires school districts to conduct comprehensive "initial evaluations" to "determine whether a child is a child with a disability" and "determine the educational needs of such child." 20 U.S.C. §§ 1414(a)-(c); *see also* 34 C.F.R. § 300.301; Cal. Educ. Code § 56320. The results of this Evaluation Duty are used to determine the child's eligibility for special education and related aids and services as well as to make decisions about an appropriate educational program for the child.

89.     IDEA and its regulations establish a comprehensive process by which a child with a disability must be evaluated. The student's eligibility must be determined, and an appropriate program of special education and related aids and services must be developed and implemented.

90.     With regard to the Evaluation Duty, a school district must use a variety of assessment strategies to gather relevant information about the child and must assess the child in "all areas related to the suspected disability." 34 C.F.R. §§ 300.304(b)(1), (c)(4). Among the data to be considered, the Evaluation Duty requires observations by teachers and related service providers; the school district must produce this data at an IEP meeting. *Id*. § 300.305. The evaluation must contain information from the child's parents and others who interact with the student on a regular basis. 20 U.S.C. §§ 1414 (b)(2)(A), (c)(1)(A). Additionally, IDEA previously mandated the use of the severe discrepancy standard in determining whether a student had a specific learning disability, but this requirement was removed in 2004 when IDEA was amended.

91.     Within 60 days from the date that the parents provide written consent to an evaluation of their child, school districts must complete the Evaluation Duty and hold an IEP meeting. Cal. Educ. Code § 56344(a). School districts must have an IEP in place at the beginning of each school year for every eligible child with a disability in its jurisdiction. 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a).

92.     The evaluation must encompass all suspected areas of the child's disability. 20 U.S.C. § 1414(a)(3)(B). Evaluation results are then discussed with parents in an IEP team meeting to determine if the child is eligible for special education. *Id*. § 1414(a)(4).

**Special Education Duty**

93.     Once determined as eligible for special education, a student receives an IEP, developed by his or her IEP team. 20 U.S.C. § 1414. Among other requirements, an IEP must include a "statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable,"16 or other evidence-based programs, and a statement of modifications and accommodations needed. *Id*. §§1414(d)(1)(A)(i)(IV-VI); 34 C.F.R. § 300.320(a)(4). Further, to develop an IEP, the student's IEP team must also consider special factors, which include a child's communication needs and "whether the child needs assistive technology devices and services." 20 U.S.C. §§1414(d)(3)(B)(vi)-(v)*; see id*. § 1401(1). In sum, the IEP requirement ensures that the district finds an educational solution appropriate to the specific needs of the child, given his or her disability and circumstances.

94.     IDEA requires school districts to ensure that all children with disabilities receive a FAPE in the LRE; thus, students with disabilities must be educated "to the maximum extent possible" with children without disabilities. 20 U.S.C § 1400(d); 34 C.F.R. § 300.114. A student with a disability can only be removed from the general education classroom if the student's education "cannot be achieved satisfactorily" with the use of supplementary aids and services. 20U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114(a)(2).

95.     Additionally, school districts have an obligation to provide instructional materials in accessible formats to students with disabilities. 20 U.S.C. § 1412(a)(23); 34 C.F.R. §§ 300.172, 300.210(b). Students with reading disorders typically do not make adequate progress in learning with grade level, print-based materials. For these materials to be accessible to these students, the materials may need to be modified or altered, which may or may not require the materials to be

converted into a specialized format. 17 U.S.C. § 121(d)(4) ("specialized formats" means "Braille, audio, or digital text which is exclusively for use by blind or other persons with disabilities" and "includes large print formats")*; see* 34 C.F.R. § 300.172(e)(1)(iv); 20 U.S.C. § 1474(e)(3)(D).

**Monitoring Duty**

96.     IDEA mandates that a child with an IEP in place must have the IEP reviewed "periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved." 20 U.S.C. § 1414 (d)(4)(A)(i). Moreover, where there is a lack of expected progress toward the annual goals and in the general education curriculum, the IEP in place must be revised to reflect updated goals, strategies, and/or resources. *Id*. § 1414(d)(4)(A)(ii)(I). School districts must regularly inform parents of their child's progress toward the annual IEP goals and their child must be reevaluated at their request and every three years *Id*. §§ 1414(a)(2)(A)(ii), (B)(ii).

**SECTION 504**

97.     Section 504 is a federal law that protects individuals with disabilities in programs and activities that receive federal financial assistance. 29 U.S.C. § 794; 34 C.F.R. §§ 104.1, .4. Specifically, Section 504 states that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance. . .” 29 U.S.C. § 794(a). Thus, Section 504 applies to all school districts that receive federal financial assistance. *Id*. § 794(b)(2); 34 C.F.R. § 104.31.

98.    According to Section 504’s implementing regulations, school districts must “designate at least one person to coordinate its efforts to comply with this part.” 34 C.F.R. § 104.7(a). School districts must provide “appropriate education” to a “qualified handicapped person.” *Id*. § 104.33. A student with a disability satisfies the definition of a “qualified handicapped person” if the student “(i) has a physical or mental impairment which substantially limits one or more major life activities [such as learning or reading], (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.” 34 C.F.R. § 104.3(j).

99.    School districts must provide the student who is a “qualified handicapped person” with an “appropriate education,” which is defined as “regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met, and (ii) are based upon adherence to procedures that satisfy the requirements of [34 C.F.R.] §§ 104.34, 104.35, and 104.36.” *Id*. § 104.33(b)(1). School districts are required to provide these students with a “free appropriate public education” “regardless of the nature or severity of the person’s handicap” and “with persons who are not handicapped to the maximum extent appropriate to the needs of the handicapped person … unless … the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily.” *Id*. §§ 104.33(a),.34(a).

100.    Before determining placement, school districts must evaluate the student who “needs or is believed to need special education or related services before taking any action” regarding the student’s placement in regular education, special education, or any other significant change in placement. *Id*. § 104.35(a). Once a student has been evaluated, school districts must consider data

about the student and make placement decisions using information from a variety of sources, create procedures to ensure that the information obtained is documented and carefully considered, ensure that the placement decision is made by a group of people, including those knowledgeable about the student, the evaluation data, and placement options, and ensure that the student is educated with nondisabled peers to the "maximum extent appropriate" for the student. *Id*. § 104.35(c).

101.    Additionally, Section 504 prohibits school districts from discrimination against students who meet the definition of a "qualified handicapped person." Specifically, [a] recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap: (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; (iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others; (iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others; . . . or (vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service. *Id.* §§ 104.4(b)(1)(i)-(iv), (vii).

102.    The regulations implementing Section 504 further state: A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing

accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons, or (iii) that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same state. *Id*. § 104.4(b)(4).

103.    For aids, benefits, or services to be "equally effective," students who are "qualified handicapped persons" must be given "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." *Id*. § 104.4(b)(2).

104.    While a student who is eligible for special education and related aids and services under IDEA receives an IEP, a student who is eligible only under Section 504 may receive a 504 Plan that like an IEP sets forth the special education and related aids and services, especially including accommodations and modifications, which the student is entitled to receive. A 504 Plan has fewer procedural requirements and procedural safeguards than an IEP.[17] Additionally, because Section 504 has a broader definition of disability than IDEA, many more students are eligible under Section 504 than under IDEA. Students who are eligible for an IEP also receive the non-discriminatory protections afforded under Section 504. However, students who are eligible only under Section 504 are ineligible for protections afforded under IDEA.

**TITLE II OF THE ADA**

**Complaint Loew v Los Angeles Unified School District**

105.   ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130.

106.   Title II of the ADA applies to all of the activities of public entities, including school districts that provide public education. The requirements regarding the provisions of a FAPE in the LRE, specifically described in Section 504 regulations, are incorporated in the general non-discrimination provisions of the applicable ADA regulation. 28 C.F.R. § 35.103(a).

107.   The implementing regulations to ADA define an individual with a disability as follows: "(a)(1) Disability means, with respect to an individual: (i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual; (ii) A record of such an impairment; or (iii) Being regarded as having such an impairment . . .." *Id.* § 35.108.

108.   The regulations implementing Title II of the ADA state that [a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability . . . (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result,to gain the same benefit, or to reach the same level of achievement as that provided to others; (iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are

as effective as those provided to others; . . . [or] (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service. *Id*. § 35.130(b)(1)(i), (ii), (iii), (iv), (vii).

109.    Further, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State." *Id*. § 35.130(b)(3).

110.    Thus, the regulations implementing Title II of the ADA require that public entities avoid unnecessary policies, practices, criteria, or methods of administration that have the effect or tendency of excluding or discriminating against individuals with disabilities. *Id*. §§ 35.130(b)(3),(8).

111.    Further, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Id.* §35.130(d). This means "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B.

112.    Further, Title II regulations require public entities to "make reasonable modifications" to their programs and services "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7)(i).

**CALIFORNIA STATE LAW**

**Complaint Loew v Los Angeles Unified School District**

**113.** California state law implementing IDEA also requires educational instruction and services to a student "with exceptional needs" if "the degree of the [student's] impairment . . . requires special education . . . ." Cal. Code Regs. tit. 5 § 3030(a) (2017); *see* Cal. Educ. Code §§ 56000 *et seq.*

**114.** The term student "with exceptional needs" includes students with SLDs, which is defined as a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may have manifested itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, ***SED***, and developmental aphasia. The basic psychological processes include attention, visual processing, auditory processing, phonological processing, sensory-motor skills, cognitive abilities including association, conceptualization, and expression. Cal. Code Regs. tit. 5 § 3030(b)(10) (2017) (emphasis added).

**115.** To determine whether a student has a reading disorder, public school districts may consider whether a student has a severe discrepancy between intellectual ability and academic achievement. *Id*. § 3030(b)(10)(B). Using severe discrepancy, however, is not the only means by which school districts can identify students with reading disorders. *Id*. § 3030(b)(10)(C). Under state regulations, students may be determined to have a SLD whether or not they exhibit a severe discrepancy. *Id*.

**116.** Additionally, as in IDEA (34 C.F.R. § 300.309(a)(1)-(3)), several other factors can be considered together in order to determine whether a student has a reading disorder. Cal. Code Regs. tit. 5 § 3030(b)(10)(C)(1)-(3). Further, [t]o ensure that underachievement in a pupil suspected of having a specific learning disability is not due to a lack of appropriate instruction in reading or math, the group making the decision must consider: (i) Data that demonstrate that prior to, or as a part of, the referral process, the pupil was provided appropriate instruction in

regular education settings, delivered by qualified personnel; and (ii) Data-based documentation of repeated assessments of achievement at reasonable intervals, reflecting formal assessment of student progress during instruction, which was provided to the pupil's parents. *Id*. § 3030(b)(10)(C)(4); 34 C.F.R. § 300.309(b).

117.    Once a student is determined to have a reading disorder and needs special education, an IEP must be created for the student. Cal. Code Regs. tit. 5 § 3040. As provided under IDEA, California law provides that students with reading disorders should also be assessed to determine the need for AT to access instructional materials and the educational curriculum. Cal. Educ. Code § 56341.1(b)(5) (student's IEP team must consider whether student requires AT devices and services); *see id.* §§ 56341.1(c) (if student's IEP team determines that the student needs AT devices and/or services, then a statement regarding this determination must be included in the student's IEP), 56020.5; Cal. Code Regs. tit. 5 § 3051.19 (2017).

118.    **Defendants' Unlawful Policies and Practices**. On information and belief, Defendants' policies and practices violate federal and state laws and implementing regulations cited above in all of the following ways:

119.    ***Failure to have in effect legally compliant policies, procedures, and programs required with respect to students with SED disorders.*** Defendants have failed to put into effect policies, procedures and programs that ensure that all students with suspected SED disorders are timely identified, located, evaluated, and that all students with eligible conditions based on SED disorders are provided appropriate special education and related aids and services, and monitored to ensure FAPE in the LRE.

120.    ***Failure to satisfy Child Find obligations with respect to students with SED disorders.*** Defendants fail to affirmatively identify or locate children with suspected SED disorders including

students in private schools. Further, the Defendant actively discourages parents from seeking

evaluations.

121.    *Failure to provide procedural safeguards to students with disabilities and their parents.*
Defendants fail to ensure that students with disabilities and their parents are provided procedural

safeguards. For example, Defendants routinely fail to provide required written notice to parents

when they refuse to evaluate or appropriately serve students with reading disorders or suspected

reading disorders. Further, Defendants fail to ensure that parents are afforded an opportunity to

meaningfully participate in decisions regarding evaluations, eligibility, and the development of

their child's IEP.

122.    *Failure to use an appropriate RTI framework for early identification and intervention for
students with suspected disabilities based on reading disorders.* Rather than providing

appropriate RTI,  including timely universal screening, intensive early and research based

intervention, and referrals of students who fail to respond for special education evaluations,

Defendants employ a "wait to fail" approach – Defendants simply wait for students who they

suspect to have a SED disorder to fall further and further behind academically, and often have

resulting emotional or behavioral deficits, before identifying, locating, and evaluating these

students for special education, if at all. As part of Defendants' "wait to fail" approach, results in

many never evaluated at all; specific IDEA service and evaluation requirements with respect to SLD

and RTI are largely ignored.

123.    *Failure to conduct timely or appropriate evaluations of students with suspected SED
disorders*. Defendants fail to evaluate students with suspected reading disorders. Defendants

frequently refuse to conduct evaluations despite repeated parental requests. Even when

evaluations occur, they are detrimentally delayed and improperly conducted.

**124.**    Prior to issuing any IEPs under the IDEA framework, in its evaluation process, The Defendants is implementing the "severe discrepancy" approach to identify whether LAUSD students have a SED disorder. This severe discrepancy standard requires a student to show a severe discrepancy between intellectual ability and academic achievement in the area of reading, writing or math in order to identify the student as having a SLD. As stated before, IDEA previously mandated the severe discrepancy standard, but removed this requirement in 2004, recognizing that the approach resulted in late identification and/or misidentification of students with learning disabilities, including reading disorders. Accordingly, the 2004 amendments to IDEA no longer require school districts to take into account severe discrepancy between intellectual ability and academic achievement, but permit states to continue to use the standard, so long as the standard is properly applied. State regulations specifically instruct school districts that students may otherwise qualify as having an SLD. Cal. Code Regs. tit. 5 § 3030(b)(10)(C) (2017).

**125.**    Defendants are not applying the "severe discrepancy" standard with fidelity or with proper consideration of all academic achievement scores. 34 C.F.R. § 300.309(b)(2); Cal. Code Regs. tit. 5 § 3030(b)(10)(C)(4) (2017); *see also* 34 C.F.R. § 300.307; Cal. Code Regs. tit. 5 § 3030(b)(10)(B) (2017). As a result, the Derfendant's application of the severe discrepancy requirement wrongly finds students ineligible under IDEA.

**126.**    ***Failure to timely develop and revise appropriate "IEPs" or "504 Plans" for students with qualifying reading disorders***.  As set forth above, Defendants systematically fail to timely develop and revise as necessary appropriate IEPs and 504 Plans that include appropriate special education and related aids and services. If and when students are finally found to have SLDs on the basis of SED disorders, Defendants have refused to offer and provide appropriately intensive research-based SED intervention services, which are essential for these students to learn and advance

academically from grade to grade. The SED interventions provided, if at all, to students with IEPs are the same as those provided to students in the district's RTI framework. Moreover, Defendants fail to appropriately monitor student progress as required by law.

**127.** Defendants also systematically fail to provide students with SED disorders with AT and instructional materials in accessible formats, which are also critical. Even if Defendants provide students with SED disorders with some form of AT, the provision of AT is neither appropriate nor consistent. Typically, students can use AT only at school, and must ask for it, which many students are too embarrassed to do. Even worse, students are blamed for not receiving AT because "they don't like it or don't know how to use it", yet Defendants completely fail to provide appropriate training or support to students, teachers, and parents on how to use AT.

**128.** Further, because Defendants often times prohibit students from taking AT home, students with SED disorders are unable to access instructional materials in accessible formats at home and are consequently unable to complete their homework.

**129.** Altogether, because Defendants fail to provide appropriate special education and related aids and services, including appropriately intensive research-based reading intervention services, students fall further and further behind. Consequently, LAUSD students with reading disorders experience and are at high risk of extreme and ongoing frustration, greater anxiety, humiliation, lowered self-esteem, and depression, which further interfere with their ability to learn to read, and to enjoy equal opportunity to fully participate in and benefit from LAUSD classrooms and instructional programs.

**130.** **Plaintiffs Are Excused from Exhaustion of Administrative Remedies.** Exhaustion of administrative remedies under the IDEA is excused when further administrative actions would be futile; when an agency has adopted a policy or pursued a practice of general applicability that is

contrary to the law; and when relief available through additional administrative efforts would be inadequate to address a plaintiff's claims for the following reasons:

**131.** Administrative remedies cannot provide adequate systemic relief such as that sought herein, administrative exhaustion is excused. Federal case law and orders issued by state administrative law judges clearly support the excusal of plaintiffs who allege system-wide claims and seek system-wide remedies from undergoing multiple due process hearings before seeking judicial relief from the courts, as due process hearings in these situations would be futile. Multiple due process complaints against a school district that challenge systemic or structural issues are "inefficient" and "ineffective" in achieving system-wide relief. *Smith v.L.A. Unified Sch. Dist.*, 830 F.3d 843, 863 (9th Cir. 2016). Such complaints based on the "same [systemic] policy" and "same evidence" would lead to "inconsistent rulings" and eventually require a federal district court to resolve any inconsistencies. *L.M.P. ex rel. E.P. v. Sch. Bd.*, 516F. Supp. 2d 1294, 1305 (S.D. Fla. 2007)

**132.** Further, past orders from administrative law judges at the Office of Administrative Hearings ("OAH") clearly demonstrate that OAH will not adjudicate system-wide legal deficiencies that are raised in due process complaints. *In the Matter of Parent on Behalf of Student v. Placentia-Yorba Linda Unified Sch. Dist.*, OAH Case No. 2014061022 (2014) ("[S]ystemic claims on behalf of other students are not only outside of OAH's jurisdiction, but run contrary to the express purpose of a due process proceeding to focus on the individual child and his or her unique educational needs."); *In the Matter of Parent on Behalf of Student v. Oakland Unified Sch. Dist.*, OAH Case No. 2014060963 (2014) (dismissing systemic claims that were raised in the due process complaint because "OAH's jurisdiction is limited to due process proceedings between a student, parent or guardian and the public agency involved in the education of the student"); *In Matter of*

*Guardian on Behalf of Student v. L.A. Unified Sch. Dist. et al.*, OAH Case No. 2010110500 (2010) (dismissing alleged violations of Due Process and Equal Protection Clauses of federal and state constitutions, Section 504, ADA, and the Unruh] Civil Rights Act because OAH lacks jurisdiction to address such claims in a due process hearing under IDEA).

**133.**    Thus, because OAH lacks the jurisdiction to adjudicate systemic issues, or order systemic relief on behalf of multiple students' claims, it would be perverse to require Plaintiffs to file multiple individual due process complaints with OAH that challenge LAUSD's unlawful systemic policies and practices regarding students with reading disorders.


Third, Plaintiffs are excused from administrative exhaustion because LAUSD's policies and practices regarding students with reading disorders are defective as a matter of law, as described herein.

**Defamation Facts**

134.    Between October 2022 and October 2023 Plaintiff Loew and Plaintiff Student A were subject to ongoing harassment and defamation by Defendant DISTRICT and Defendant TEACHER Daniel Bauman and Andrea Gewirz. Defendant TEACHER Gewirz is also the biological mother of Plaintiff Student A.   At trial evidence will show that Defendant TEACHER Bauman and TEACHER Gewirz engaged in a conspiracy defined by California Penal Code 182.2 to engage in Defamation and Harassment of Plaintiff LOEW and Plaintiff Student A.

135.    In October 2022 Defendant DISTRICT, Defendant ADMINISTRATOR Alberto Carvalho and Administrator David Baca allowed Teachers Daniel Bauman and Andrea Gerwiz to post defamatory and false information on X formerly known as Twitter.  This information related to the Plaintiff STUDENT A academics and Plaintiff A conduct and interactions with Defendant District.

Defendant Teachers were fully aware that the information they were publishing was false and inaccurate.  In October of 2023, Plaintiff A received a letter from California Teacher Credentialing the Teacher Dan Bauman received a suspension of his teaching credential for 10 days.

### CLASS ACTION DEFINITION ALLEGATIONS

136.    Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action for injunctive and declaratory relief on their own behalf and on behalf of all similarly situated students. The Plaintiffs seek to represent the following Classes in this matter, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), as follows:

137.    **CLASS 1**: All current and future LAUSD Students who have or may have disabilities because of SED's within the meaning of IDEA/related state laws and/or Section 504/ADA and who are or may be subject to LAUSD policies and practices concerning identification of students for the purposes of offering special education and related aids and services

138.    **CLASS 2**: All current and future LAUSD Students who have or may have disabilities because of SED disorders such as ADHA within the meaning of IDEA/related state laws and/or Section 504/ADA and who are or may be subject to LAUSD's policies, procedures and practices concerning evaluations for the purposes of determining eligibility for special education and related aids and services.

139.    **CLASS 3**: All current and future LAUSD Students who have or may have disabilities because of SED disorders such as ADHD within the meaning of IDEA/related state laws and/or Section 504/ADA and who are or may be subject to LASDU policies, procedures and practices concerning provision of special education and related aids and services, including appropriately intensive

research-based reading interventions, and accommodations and modifications as necessary to ensure a non-discriminatory FAPE.

140.     **CLASS 4**: All current and future LAUSD Students who have or may have reading disorders such as dyslexia within the meaning IDEA/related state laws and/or Section 504/ADA who are or may be subject to LAUSDs policies, procedures and practices concerning monitoring student progress to determine effectiveness of services provided and need for further evaluation and/or revisions to their IEPs or 504 Plans.

141.     This action is an appropriate class action under Rule 23(b)(2), as LAUSD has acted or refused to act on grounds that apply generally to each Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting each Class as a whole.

142.     **Class 5,** All Current and Future LAUSD Parents who receive Disruptive persons Letters or Disruptive persons Warning letters without due Process.

143.     **Numerosity**. The persons in these Classes are so numerous that joinder of all such persons is impracticable. Reading disorders affect a significant portion of the student population, the prevalence of which has been estimated between 5% and 17%.35 At present, LAUSD includes approximately 42850 students in grades K through 12. Accordingly,

144.     Defendants' deficient policies and practices impact many hundreds of current and future students.

145.     **Commonality**. There are questions of law and fact common to each Class identified above, namely whether LAUSD's policies, procedures and practices related to identification, evaluation, eligibility determination, provision of special education and related aids and services, and monitoring of student progress to determine effectiveness of services provided and need for

further evaluation and/or revisions to their IEPs or 504 Plans, violate IDEA and related state laws and/or Section 504/ADA.

146.    **Typicality**. The claims of the named Plaintiffs are typical of the claims of the Classes, identified above, in that each of the named Plaintiffs is an individual with a SED Disorders, such as ADHD, that qualifies him or her as eligible for special education and related aids and services under IDEA and related state laws and/or Section 504/ADA, but named Plaintiffs: (1) were not timely identified pursuant to Defendants' Child Find Duty; (2) have not received a timely and appropriate evaluation and eligibility determination; (3) have not received timely and appropriate provision of special education and related aids and services, including an adequate IEP or 504 Plan; and (4) have not received appropriate monitoring of their progress or review of special education and related aids and services documented in their IEP or 504 Plan.

147.    **Adequate Representation**. The named Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiffs do not have any interests antagonistic to the members of any Class. The relief sought by Plaintiffs will inure benefit to the members of each Class. Additionally, Plaintiffs are represented by counsel who are experienced, skilled, and knowledgeable about civil rights litigation, disability rights, and class action litigation.

**VIOLATION OF CA EDUCATION CODE [51100 – 51102] (AGAINST DEFENDANTS GREENBERG AND DEFENDANT GALLETTE)**

148.    Plaintiff, individually, incorporates by reference as though fully set forth herein, each and every allegation set forth above in this Complaint. As a ten, separate and distinct cause of action, Plaintiff complains against Defendants as follows:

149.    The Plaintiff believes that Defendants Greenberg and Gallette engaged in a civil conspiracy to withhold civil rights from Student A and Loew and prevent him from participating in his minor child's education without due process of law.

150.    On Numerous occasions Plaintiff Loew asked for meetings to discuss Student A's failing grades.  While meetings were scheduled Defendant Greenberg forced that meeting to be canceled.

151.    The Plaintiff was denied his civil right to Equal Protection under the Law.

152.    On multiple occasions Mr. Loew requested to speak with Defendant Greenberg relating to his minor Childs education. Defendant Greenberg failed to respond to Mr. Loew.

**Causes of Action**

**First Cause of Action**

**(All Defendants)**

**Violations of the IDEA, 20 U.S.C. §§ 1400 *et seq.*, 34 C.F.R. Pt. 300**

**(On Behalf of All Plaintiffs, Class Members)**

153.    Plaintiffs incorporate the preceding paragraphs of this Complaint as set forth in full herein. IDEA mandates that students with disabilities, between ages 3 and 21, have access to a FAPE in the LRE. 20 U.S.C. § 1412(a)(1)(A). Students with suspected disabilities are entitled to a full and individual evaluation under IDEA. *Id*. § 1412(a)(7), 20 U.S.C. §§ 1414(a)-(b). IDEA additionally

mandates that school districts that offer and provide RTI must provide appropriate research-based interventions. 20 U.S.C. § 1414(b)(6)(B); 34 C.F.R. § 300.309(a)(2)(i). The rate of the student's progress in these interventions may be used as a part of the identification, referral, and evaluation process. 34 C.F.R. §§ 300.309(b)(1)-(2); Cal. Code Regs. tit. 5 §§ 3030(b)(10)(C)(4)(i)-(ii) (2017). Upon evaluation and determination of eligibility for special education and related services, IDEA mandates the development and subsequent monitoring of a specially designed IEP to ensure that appropriate educational services, including specialized instruction, such as appropriately intensive research-based reading interventions, related services, supplementary aids and services, based on peer-reviewed research to the extent practicable; accommodations and modifications, AT and accessible materials are provided to students with disabilities as needed to ensure a FAPE in the LRE. 20 U.S.C. § 1414(d). Child and parental input are required to be taken into account. *Id*. § 1414 (a)(1)(D), (b); 34 C.F.R., Pt.300.

154.    All Plaintiffs and Class Members are or may be a "child with a disability" because they (1) have or may have a SLD due to a reading disorder, including but not limited to dyslexia, and (2) need or may need special education and related aids and services.

155.    Defendants are the recipients of federal funds under the IDEA sufficient to invoke coverage under the IDEA. 20 U.S.C. § 1412(a).  As set forth above, Defendants' policies and practices regarding students with SLDs due to a reading disorder constitute a persistent and systemic failure to meet the requirements of IDEA. Thus, Defendants have deprived each Plaintiff and have or may deprive Class Members of a FAPE in the LRE.

156.    As a direct and proximate result of Defendants' violations, each Plaintiff has suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

157.    No administrative remedy exists under IDEA to address these wholesale violations by Defendants.

158.    Due to Defendants' ongoing violations of IDEA and implementing regulations, injunctive and declaratory relief are appropriate remedies.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**Second Cause of Action**

**(All Dependents)**

**Violations of Section 504, 29 U.S.C. § 794, 34 C.F.R. Pt. 104**

**(On Behalf of All Plaintiffs, Class Members)**

159.    Plaintiffs incorporate the preceding paragraphs of this Complaint as set forth in full herein. Section 504 provides in relevant part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .." 29 U.S.C. § 794(a); *see* 34 C.F.R. §§ 104.4(b), .21,.43(a).

160.    Section 504 mandates that a student who is eligible for special education and related aids and services under Section 504 is entitled to receive FAPE. 34 C.F.R. § 104.33

161.    All Plaintiffs are and Class Members are or may be qualified individuals with disabilities within the meaning of Section 504 and are or may be otherwise qualified to participate in or receive benefits from Defendants' programs or activities. 29 U.S.C. § 794(a).

162.    Defendants have been and are a recipient of federal financial assistance sufficient to invoke the coverage of Section 504. *Id.* § 794(b)(3).

163.    As set forth above, Defendants' policies and practices regarding students with learning disabilities due to a reading disorder constitute a persistent and systemic failure to meet the requirements of Section 504 and discriminate against all Plaintiffs and Class Members, solely by reason of their disability in violation of Section 504.

164.    Thus, Defendants have deprived each Plaintiff and have or may deprive Class Members of a FAPE.

165.    As a direct and proximate result of Defendants' violations, Plaintiffs have suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

166.    Due to Defendants' ongoing violations of Section 504 and implementing regulations, injunctive and declaratory relief are appropriate remedies.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**Third Cause of Action**

**(All Defendants)**

**Disability Discrimination - Failure to Accommodate in Violation of Title II of the ADA**

**42 U.S.C. §§ 12131 *et seq.*, 28 C.F.R. § 35.130**

**(On Behalf of All Plaintiffs, Class Members)**

167.    Plaintiffs incorporate the preceding paragraphs of this Complaint as set forth in full herein.

Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by such `entity." 42 U.S.C. § 12132; *see* 28 C.F.R. §§ 35.130(a), (b)(1)-(3), (b)(7)-(8), (d).

168.    The requirements regarding the provisions of FAPE, specifically described in Section 504 regulations, are incorporated in the general non-discrimination provisions of the applicable ADA regulation. 28 C.F.R. § 35.130(a).

169.    Each Defendant is either a public entity subject to Title II of the ADA or an official responsible for supervising the operations of a public entity subject to Title II of the ADA. 42 U.S.C. § 12131(1). All Plaintiffs are and Class Members are or may be qualified individuals with disabilities within the meaning of Title II of the ADA and meet the essential eligibility requirements for the receipt of services, programs, or activities of Defendants. *Id.* § 12131(2).

170.    As set forth above, Defendants' policies and practices regarding students with learning disabilities due to a reading disorder constitute a persistent and systemic failure to meet the requirements of Title II of the ADA and discriminate against all Plaintiffs and Class Members, solely by reason of their disability in violation of requirements of ADA by denying all Plaintiffs and Class Members an equal and equally effective educational opportunity in the most integrated setting appropriate, and instead providing all Plaintiffs and Class Members with a separate, different, and inferior educational experience.

171.    Thus, Defendants have deprived each Plaintiff and have or may deprive Class Members of a FAPE.

172.    As a direct and proximate result of Defendants' violations, Plaintiffs have suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

173.     Due to Defendants' ongoing violations of Title II of the ADA and implementing regulations, injunctive and declaratory relief are appropriate remedies.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**Fourth Cause of Action**

**(All Defendants)**

**Violations of Cal. Educ. Code §§ 56000 *et seq.*, Cal. Code Regs. Tit. 5 §§ 3030 *et seq.***

**(On Behalf of All Plaintiffs, Class Members)**

174.     Plaintiffs incorporate the preceding paragraphs of this Complaint as set forth in full herein.

175.     California law requires that "[a] child shall qualify as an individual with exceptional needs . . . if the results of the assessment as required by [the] Education Code . . . demonstrate that the degree of the child's impairment as described in subdivisions (b)(1) through (b)(13) requires special education in one or more of the program options authorized by [the] Education Code." Cal. Code Regs. tit. 5 § 3030(a) (2017).

176.     Defendants are responsible for providing public education to LAUSD students, including all Plaintiffs and Class Members.

177.     As set forth above, Defendants have denied students of a FAPE in the LRE.

178.     As a direct and proximate result of Defendants' violations, Plaintiffs have suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

179.    Thus, Defendants have deprived each Plaintiff and have or may deprive Class Members of FAPE in the LRE.

180.    As a direct and proximate result of Defendants' violations, Plaintiffs have suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

181.    Due to Defendants' ongoing violations of the California Education Code Section 56000 *et seq*. and implementing regulations, injunctive and declaratory relief are appropriate remedies.

182.    All Plaintiffs are and Class Members are or may be students with "exceptional needs" within the meaning of California regulations. *Id*. § 3030(b).


WHEREFORE, Plaintiffs pray for relief as set forth below.


**FIFTH CAUSE OF ACTION**

**(All Defendants)**

**[AMERICAN WITH DISABILITIES ACT, CALIFORNIA CIVIL CODE, Sections 54.1,**

**52, et. seq.]**

**(On Behalf of All Plaintiffs, Class Members)**

183.    Plaintiffs' reallege and incorporate by reference paragraphs I through 182. and the Factual Allegations, *supra,* as though fully set forth herein, including but not limited to, Plaintiff Student A is a minor with disabilities, including but not limited to, speech impediments, and Plaintiffs believe and allege that, in part, the acts of all Defendants, the rights and privileges of Plaintiffs were violated as the Defendants failed to provide full and equal access, meaningful access to, all the rights, obligations, and services of the Defendants.

184.    Defendants' actions and mindset, clearly contradict the statutes, laws, including but not limited to, the U.S. Constitution and the 14th Amendment, which enforces equality for all, the American with Disabilities Act, the California Civil Code section 54.1, et. Seq., and as specifically stated in the Declaration of independence, "We hold these truths to be self-evident that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness."

185.    According to the California Civil Code sections 54.1, all persons with disabilities shall be entitled to full and equal access, like other members of the general public, to the rights, obligations, and services of all Defendants. As a result of the conduct of Defendants, Plaintiffs and Members of the Class suffered damages, as described in this complaint, including actual damages within the meaning of California Civil Code section of California Civil Code §§51,52 and 52.1.

186.    Defendants either performed the acts stated herein and are individually liable for their individual acts; and/or Defendants performed the acts stated herein during the course and scope of their employment, acting under color of law, apparent authority and are individually liable for hose acts; and/or Defendants are vicariously liable for each other; and/or Defendants are liable for each other under the doctrine of *respondent superior;* and/or Defendants are liable under conspiracy of each other. California Penal Code §830.31, §835(a), §836, *Inouye v. County of Los Angeles,* (1995) 30 Cal.App.4th 278, 35 Cal.Rptr.2d 367, *Rest.2d Torts, § 40A,* Penal Code Section 236, 784, Civil Code section 43, Civil Code Section 3333; *Graham v. Connor,* ( 1989)490 U.S. 386 1989.

187.    As a result of the conduct of Defendants, Plaintiffs are entitled to an award of exemplary damages, civil penalties, and costs and attorneys' fees, as provided by California Civil Code §§51, 51.7, 52, 52.1., and the ADA.

**SIXTH CAUSE OF ACTION**

**(All Defendants)**

**Infliction of Emotional Distress**

**(On Behalf of All Plaintiffs, Class Members)**

**[INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS!**

188.    Plaintiffs relegation and incorporate by reference paragraphs 1 through193, and the Factual Allegations, *supra,* as though fully set forth herein.

189.     Defendants intentionally and/or negligently caused serious emotion distress upon Plaintiff, Student A, through the extreme and outrageous conduct of all Defendants, exceeding all bounds of decency in society, wherein Defendant, Greenberg, and Defendant Gallette, ignored the plea of Plaintiff, Adam Loew on going request to provide Plaintiff Student A special education assessment.

190.    Defendant District and Defendant ADMINISTOR GREENBERG use the DISRUPTIVE WARNING LETTER process in such an OUTRAGOUS manner to inflict emotional distress on Plaintiff LOEW to harass him to the point that Plaintiff LOEW was hospitalized.

191.    Defendant TEACHER GEWIRZ filed an action in the California Family Court on behalf of Defendant DISTRICT, Defendant ADMINISTRATOR CARVALO, and BACA and Defendant DISTRICT employees, to restrict Plaintiff A's Access to Student A's Education and School. This is not a matter for the Family Court.   Due to the emotional distress caused by Defendant DISTRICT and Defendant TEACHER GEWIRZ on Plaintiff LOEW was hospitalized on 9/28/2023, and Plaintiff STUDENT A, was diagnosed with Anxiety.

195.    In addition, this instance is additionally concerning as Alyssa Gallette was trying to prevent Isabella from reading books about BIOPIC and AAPI protected groups.   This is a specific violation of AB-1078 and points to discrimination against BIOPIC and AAPI individuals by Alyssa Gallette.

196.    Alyssa Gallette also violated Isabella's Right pursuant to the Individuals with Disabilities Education act the Child Find Mandate. The Individuals with Disabilities Education Act (IDEA) includes the Child Find requirement. Child Find requires all school districts to identify, locate, and evaluate all children with disabilities, regardless of the severity of their disabilities. This obligation to identify all children who may need special education services exists even if the school is not providing special education services to the child. IDEA requires all states to develop and implement a practical method of determining which children are children with disabilities are receiving special education and related services and which children are not.

197.    Instead of actively pursuing services for Isabella, Alyssa Gallette instead decided to embarrass, humiliate, and discriminate against Isabella due to her disability.  It also appears that Alyssa Gallette's discrimination against Isabella as a child with disabilities is a violation of the IDEA Act provision of Isabella's Right to a Free Appropriate Public Education (FAPE) for students with disabilities.

198.    In this case Alyssa Gallette's withholding of educational materials such as school issued computer as a punishment related to Isabella's disability does not provide Isabella her right to a Free Public Education.

199.    As a result of Alyssa Gallette's harassment embarrassment and disability discrimination of Isabella, is suffering from extreme emotional distress and exacerbation of her emotional and mental disabilities.

200.     In a Suicide Assessment at LAUSD Isabella specifically stated she does not have any friends and she does not trust the Pomelo Principal Janice Greenberg or Alyssa Gallette (Exhibit D).   It is of significant concern that Alyssa Gallette's discriminatory actions related to Isabella's disabilities have caused Isabella significant emotional harm.

201.     Defendants either performed the acts stated herein and are individually liable for their individual acts; and/or Defendants performed the acts stated herein during the course and scope of their employment, acting under color of law, apparent authority and are individually liable for those acts; and/or Defendants are vicariously liable for each other; and/or Defendants are liable for each other under the doctrine of *respondent superior;* and/or Defendants are liable under

202.     As a direct, legal, and proximate result of Defendants' conduct, Plaintiff LOEW and Plaintiff STUDENT A suffered mental injuries and emotional distress, as a result of the conduct of all Defendants. As an actual and proximate result of Defendants' conduct, Plaintiffs have suffered, and continue to suffer, general and special damages, including but not limited to, physical and mental injuries, medical expenses, losses in earnings, bonuses, deferred compensation and other employment benefits and have suffered and continue to suffer pain, suffering, embarrassment, humiliation, emotional distress, severe emotional distress, and mental anguish in an amount according to proof. Defendants engaged in the vicious conduct maliciously, willfully, and oppressively, and with the intent to harm Plaintiffs. Defendants engaged in despicable conduct and acted with a conscious disregard of Plaintiffs' rights and with intent to vex, injure, or annoy Plaintiffs such as to constitute oppression, fraud, or malice punishable with exemplary damages under Civil Section 3294.

SEVENTH CAUSE OF ACTION

(All Defendants)

Defamation Per Se

**(On Behalf of All Plaintiffs, Class Members)**

203.    Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein. Plaintiff is informed and believes Defendants, and each of them, by the herein-described acts, conspired to, and in fact, did negligently, recklessly, and intentionally cause external statements of defamation, of and concerning Plaintiff, to third persons and to the community. These false and defamatory statements included express and implied statements that portrayed Plaintiff LOEW as a person who made knowingly false complaints designed to harm Defendant DISTRICT, ADMNINITRATOR and TEACHER when the reality was that Plaintiff LOEW was trying to help DEFENDANT DISTRICT by reporting illegal or improper conduct. Specifically, Defendant TEACHER BAUMAN posted several statements on X formerly known as Twitter that LOEW was "harassing" Defendant DISTRICT staff. In another instance Defendant District allowed Defendant Teachers to File Civil Harassment Orders against Plaintiff LOEW in which there is CLEAR evidence that Defendant DISTRICT knowing that Defendant TEACHER's were engaged in Perjury in violation of California Penal Code 118 PC.

204.    During the above-described timeframe, Defendants, and each of them, conspired to, and in fact, did negligently, recklessly, and intentionally cause excessive and unsolicited dissemination of defamatory statements, of and concerning Plaintiff, to third persons, who had no need or desire to know. Those third person(s) to whom these Defendants disseminated this defamation are believed to include, but are not limited to, other agents and employees of Defendants, and each of them,

1  and the community, all of whom are known to Defendants, and each of them, but unknown at this

2  time to Plaintiff.

3
4  205.    The defamatory statements consisted of oral, written knowingly false, and unprivileged

5  communications, intending directly to injure Plaintiff and Plaintiff's personal, business, and

6  professional reputation. These statements included the following false and defamatory statements

7  (in violation of Civil Code §§ 45, 45a and 46(3)(5)) with the meaning and/or substance as follows:

8  that Plaintiff LOEW harassed Defendant DISTRICT  staff, and other similar false statements

9
10 expressly and impliedly stated that Plaintiff LOEW contrived the issues he brought to the attention

11 of Defendant DISTRICT management and intentionally sought to whine and complain without

12 reason and for the detriment of the Defendant District.

13 206.    Plaintiff is informed, believes, and fears that these false and defamatory per se statements

14
15 will continue to be made by Defendants, and each of them, and will be foreseeably recirculated by

16 their recipients, all to the ongoing harm and injury to Plaintiff's business, professional, and

17 personal reputations. Plaintiff also seeks redress in this action for all foreseeable statements,

18 including his own compelled self-publication of these defamatory statements.

19
20 207.    The defamatory meaning of all of the above-described false and defamatory statement and

21 their reference to Plaintiff, were understood by these above-referenced third person recipients

22 and other members of the community who are known to Defendants, and each of them, but

23 unknown to Plaintiff at this time. 86. None of Defendants' defamatory statements against Plaintiff

24 referenced above are true.

25
26 208.    The above defamatory statements were understood as assertions of fact, and not as

27 opinions. Plaintiff is informed and believes this defamation will continue to be negligently,

28 recklessly, and intentionally published and foreseeably republished by Defendants, and each of

them, and foreseeably republished by recipients of Defendants' statements, thereby causing

additional injury and damages for which Plaintiff seeks redress by this action.

209.    Each of these false defamatory per se statements (as set forth above) were negligently,

recklessly, and intentionally published in a manner equaling malice and abuse of any alleged

conditional privilege (which Plaintiff denies existed), since the statements, and each of them, were

made with hatred, ill will, and an intent to vex, harass, annoy, and injure Plaintiff in order to justify

the illegal and cruel actions of Defendants, and each of them, to cause further damage to

Plaintiff's professional and personal reputation.

210.    Each of these statements by Defendants, and each of them, were made with the

knowledge that no investigation supported the unsubstantiated and obviously false statements.

The Defendants published these statements knowing them to be false and unsubstantiated by any

reasonable investigation. These acts of publication were known by Defendants, and each of them,

to be negligent to such a degree as to be reckless. In fact, not only did Defendants, and each of

them, have no reasonable basis to believe these statements, but they also had no belief in the

truth of these statements, and in fact knew the statements to be false. Defendants, and each of

them, excessively, negligently, and recklessly published these statements to individuals with no

need to know, and who made no inquiry, and who had a mere general or idle curiosity of this

information.

211.    The above complained-of statements by Defendants, and each of them, were made with

hatred and ill will towards Plaintiff and the design and intent to injure Plaintiff, Plaintiff's good

name, his reputation, employment, and employability. Defendants, and each of them, published

these statements, not with an intent to protect any interest intended to be protected by any

privilege but with negligence, recklessness, and/or an intent to injure Plaintiff and destroy his

reputation. Therefore, no privilege existed to protect any of the Defendants from liability for any of these aforementioned statements.

212.    As a proximate result of the publication and republication of these defamatory statements by Defendants, and each of them, Plaintiff has suffered injury to his personal, business, and professional reputation including suffering embarrassment, humiliation, severe emotional distress, shunning, anguish, fear, loss of employment, and employability, and significant economic loss in the form of lost wages and future earnings, all to Plaintiff's economic, emotional, and general damage in an amount according to proof.

213.    Defendants, and each of them, committed the acts alleged herein recklessly, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, for an improper and evil motive amounting to malice (as described above), and which abused and/or prevented the existence of any conditional privilege, which in fact did not exist, and with a reckless and conscious disregard of Plaintiff's rights. All actions of Defendants, and each of them, their agents, and employees, herein alleged were known, ratified, and approved by the Defendants, and each of them. Plaintiff thus is entitled to recover punitive and exemplary damages from Defendants, and each of them, for these wanton, obnoxious, and despicable acts in an amount based on the wealth and ability to pay according to proof at time of trial. 93. Defendant's defamatory statements were a substantial factor in causing Plaintiff harm.

214.    Plaintiff has been damaged in an amount in excess of the jurisdictional limits of this Court.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**EIGHTH CAUSE OF ACTION**

**(As against Defendant DISTRICT and DOES 1 through 20).**

**NEGLIGENCE**

**(On Behalf of All Plaintiffs, Class Members)**

215.    Plaintiff re-alleges and incorporates herein by reference each and every allegation contained herein above as though fully set forth herein in the present cause of action. 39. Education Code § 234-234.4, Education Code Sections §§ 32280-32282, 32286, 32288, and California Code of Regulations, Title 5 Section 5552, all support the legal principle that the Defendants have a duty to protect and properly supervise students on school grounds. See also *Lucas v. Fresno Unified School District* (1993) 14 Cal.App.4th 866; *Hoyem v. Manhattan Beach School District*, (1978) 22 Cal 3d 508, 513. The Defendant DISTRICT, and its ADMINISTRATORS, ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, owed a duty of care to STUDENT A because said Defendants knew that by providing education to minors, they were charged with the safety and well-being of STUDENT A AND THOSE IN SIMILAR SITUATIONS. California law mandates that School Districts, Administrators, Staff, and teachers have a duty to supervise students and to enforce rules and regulations to protect them.

216.    At all pertinent times, the Defendant DISTRICT, and its ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, owed Plaintiff LOEW, STUDENT A and  THOSE IN SIMILAR SITUATIONS a legal duty. Such legal duty required said Defendant DISTRICT, and its ADMINISTRATORS, ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, to act with reasonable care when: (1) supervising students, such as STUDENT A AND THOSE IN SIMILAR SITUATIONS; (2) Protecting STUDENT A AND THOSE IN SIMILAR SITUATIONS while she was a student at POMELO and in the care of the said Defendants; (3) Providing a reasonably safe environment and adequate supervision of STUDENT A AND THOSE

IN SIMILAR SITUATIONS; (4) Providing the appropriate training on the responsibilities and

procedures for supervising students of the Defendant DISTRICT; and (5) the Defendant DISTRICT,

and its ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES

1-100 inclusive, providing the appropriate training on the responsibilities and procedures for

supervising students of the Defendant DISTRICT.

217.    The said Defendant DISTRICT, and its ALBERTO M. CARVALHO, DAVID BACA, JANICE

GREENBERG, AND MARGRET KIM, and DOES 1-100, inclusive, and the staff of POMELO, inter alia,

(a) had a lack of safety protocols and procedures requiring school administrators, teachers and

aides to supervise students in and outside of the classroom, including the bathrooms; (b) had a

lack of safety protocols and procedures requiring that no student was unaccounted for while on

campus; (c) had a lack of protocols and procedures to ensure that students, such as STUDENT A

AND THOSE IN SIMILAR SITUATIONS, had the proper supervision to ensure that STUDENT A AND

THOSE IN SIMILAR SITUATIONS was not DISABILITY DISCRIMINATION AND HARASSMENT  for while

she was on the POMELO campus.

218.    The said Defendant DISTRICT, and its ALBERTO M. CARVALHO, DAVID BACA, JANICE

GREENBERG, AND MARGRET KIM, and DOES 1-100, inclusive, failed to implement training of staff,

administrators, and teachers regarding safety protocols and procedures as to the proper

supervision of students and INTERN TEACHERS to ensure they are not left alone while under their

supervision; and Defendant DISTRICT, and its ALBERTO M. CARVALHO, DAVID BACA, JANICE

GREENBERG, AND MARGRET KIM, and DOES 1-100, inclusive, negligently and carelessly failed to

adopt and implement protocols and procedures as to the proper supervision and care of minors

during school-hours especially with regard to a large campus like POMELO.

219.    The said Defendant DISTRICT, and its ADMINISTRATORS, ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, inclusive, knew or should have known, that fatal drug overdoses were on the rise in the Los Angeles Unified School District and that bathrooms were common places for drug sales and consumption by students. On September 13, 2022, during school hours, Defendant DISTRICT, and its ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, inclusive, did not properly supervise the students on campus, including the bathrooms, and failed to provide the requisite level of care to ensure the student's safety. The negligence of the Defendant DISTRICT, and its ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100 in failing to protect STUDENT A AND THOSE IN SIMILAR SITUATIONS, proximately caused the wrongful death of DECEDENT RAMOS; and all of the negligent failures of the Defendant DISTRICT, and its ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, was a substantial factor and a proximate cause of STUDENT A AND THOSE IN SIMILAR SITUATIONS emotional distress, and disability discrimination.

220.    Defendant DISTRICT, and its ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, inclusive, had special duties to protect the minor DECEDENT RAMOS, and the other students at BERNSTEIN, when such students were entrusted to their care by their parents. Defendant DISTRICT, and its ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, had a *special relationship* with DECEDENT RAMOS. Defendant DISTRICT, and its ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, had a duty of care of DECEDENT under *in loco parentis.* Defendant DISTRICT, and its ADMINISTRATORS, ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, and each of them voluntarily accepted the

entrusted care of STUDENT A AND THOSE IN SIMILAR SITUATIONS. As such, Defendant DISTRICT, and its ADMINISTRATORS, ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100 owed DECEDENT RAMOS, a special duty of care, in addition to a duty of ordinary care, and owed Plaintiff LOEW and THOSE IN SIMILAR SITUATIONS the higher duty of care that adults dealing with children owe to protect them from harm. The duty to protect and warn arose from the special, trusting, confidential, and fiduciary relationship between Defendant DISTRICT, and its ADMINISTRATORS, ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, and Plaintiff PEREZ instilled great trust, faith and confidence in Defendant DISTRICT, and its ADMINISTRATORS, ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100

221.    . All of the negligent conduct of the Defendant DISTRICT, and its ADMINISTRATORS, ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, inclusive, was harmful and caused damage to Plaintiff LOEW, STUDENT A AND THOSE IN SIMILAR SITUATIONS.

222.    The negligent conduct alleged herein was either known, or should have been known, by Defendant DISTRICT, and its ADMINISTRATORS, ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, or by the use of reasonable care should have been discovered, and that such conduct caused foreseeable damages to Plaintiff LOEW, STUDENT A AND THOSE IN SIMILAR SITUATIONS.

223.    Defendant DISTRICT, and its ADMINISTRATORS, ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, inclusive, negligently failed to provide proper supervision of minor students, such STUDENT A AND THOSE IN SIMILAR SITUATIONS, on the BERNSTEIN campus during school hours and Defendant DISTRICT, and its ADMINISTRATORS,

ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, breached their duty of care to Plaintiff LOEW, STUDENT A AND THOSE IN SIMILAR SITUATIONS.

224.    Defendant DISTRICT, and its ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, inclusive, were negligent in their supervision of DECEDENT RAMOS and failed to use reasonable care to protect all its students, including Plaintiff STUDENT A AND THOSE IN SIMILAR SITUATIONS from known or foreseeable dangers, pursuant to Government Code §§ 820, 815.2.

225.    On September 13, 2022, STUDENT A was subjected to emotional abuse and disability discrimination. Despite the knowledge and awareness of Intern Teacher Alyssa Gallette's lack of experience with children with disabilities, STUDENT A was left unprotected, by Defendant DISTRICT, and its ADMINISTRATORS, ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100; and DECEDENT was left under the care of an unsupervised teacher who did not have experience with children with disabilities.

226.    The conduct of Defendant DISTRICT, and its ADMINISTRATORS ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND MARGRET KIM, and DOES 1-100, and each of them, as herein set forth above, was tortious and the direct and proximate cause of the damages suffered by STUDENT A.

**NINTH CAUSE OF ACTION**

**(As against Defendant DISTRICT and DOES 1 through 20).**

**NEGLIGENT SUPERVISION OF STUDENTS, SUCH AS STUDENT A**

**(On Behalf of All Plaintiffs, Class Members)**

227.    As an educational institution for minors, where all of the students are entrusted to the teachers, counselors, advisors, mentors, faculty members and administrators, Defendant DISTRICT,

and its ADMINISTRATORS, ALBERTO M. CARVALHO, DAVID BACA, JANICE GREENBERG, AND

MARGRET KIM, and DOES 1-100and each of them, expressly and implicitly represented that they

would properly supervise and provide for the safety of STUDENT A.

228.    All Defendants negligently failed to supervise the students of the POMELO campus,

including DECEDENT RAMOS.  Said Defendants did not properly supervise Intern Teacher Alyssa

Gallette and did not adequately supervise STUDENT A as is required by state law. Instead,

Defendants left STUDENT A in the emotionally abusive hands of an inexperienced teacher ALYSSA

GALLETTE. Defendants' conduct was a breach of their duties to Plaintiffs.

**PRAYER FOR RELIEF**

235    An order certifying this case as a class action under California Rules of Civil Procedure

appointing Plaintiffs as Class Representatives of the Classes and their attorneys as Counsel for all

Classes.

236    Declare that Defendants' policies, procedures, and practices regarding students with and

who are suspected to have reading disorders violate the rights of all Plaintiffs and Class Members,

under IDEA, Section 504, ADA, and Section 56000.

237    Issue preliminary and permanent injunctions pursuant to IDEA, Section 504, ADA, and

Section 56000 that enjoin Defendants, their successors in office, agents, employees and assigns,

and all persons acting in concert with them to promulgate compliant policies, procedures, and

practices.

238    Order Defendants to: Immediately take action to reform policies, procedures and practices

to fully comply with IDEA, Section 504, ADA and Section 56000, including with respect to the RTI

program that serves all students in LAUSD. Create a new Board of Education-approved policy

**Complaint Loew v Los Angeles Unified School District**

statement acknowledging the rights of students with reading disorders, outlined above, summarizing policy reforms, and reasserting Defendants' commitment to honor those rights.

239    Provide immediate and continuing education and evaluation of progress toward compliance by qualified third-party experts. Experts should provide training to all LAUSD staff outlining all of the above legal requirements: "Child Find," RTI, universal screening, evaluation/identification, appropriate research-based reading intervention services, related services, supplementary aids and services, accommodations and modifications, including but not limited to AT and accessible materials, for students with reading disorders. Experts should also provide program evaluation following implementation of reforms;

240    Establish appropriate, peer-reviewed research programs to the extent practicable or other evidence-based programs that are necessary to provide a FAPE in the LRE to students with reading disorders;

241    Commit to identifying staff responsible for any violations of the laws cited above for re-training, follow-up review, and appropriate disciplinary action;

242    Develop a "practical method" to carry out "Child Find" duties and identify all students with suspected reading disorders. Offer complete evaluations of these students in compliance with IDEA, Section 56000 and Section 504/ADA; and through a fully compliant process that affords procedural safeguards to students with disabilities and their parents, offer and provide a FAPE in the LRE as appropriate to all students found eligible in accordance with IDEA, Section 56000 and Section 504/ADA.

243    An order awarding Plaintiffs reasonable attorneys' fees, costs, and disbursements, as authorized by law; and

**Complaint Loew v Los Angeles Unified School District**

244     Award Plaintiff Actual and compensatory damages in a sum according to proof at time of trial and ;

245     Consequential and incidental damages in a sum according to proof at time of trial; and

246     General damages, including damages for mental and emotional distress, in a sum according to proof at time of trial; and

247     . Prejudgment interest at the legal prevailing rate; and   for punitive and exemplary damages in a sum according to proof at trial; and

248       For costs of suit herein incurred; and

249     For such other and further relief as the court deems proper

DATED: December 22, 2023

*Adam Loew*

_____
ADAM LOEW
In Pro Per